Filed 4/17/15  P. v. Cortez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARCEL CORTEZ,<br><br>        Defendant and Appellant. | A140355<br><br>(San Francisco City & County<br>Super. Ct. No. SCN220770) |

**I.**

**INTRODUCTION**

Following his guilty plea to continuous sexual abuse of a child (Pen. Code, section 288.5, subd. (a))[1], the trial court ordered appellant to pay $115,747.50 restitution to cover the cost for the minor victim to attend an out-of-state private therapeutic boarding school for middle and high school-aged girls.  As he did below, appellant claims on appeal "the trial court's order that appellant pay for [the victim's] private school education in the amount of $115,747.50 exceeds the bounds of reasonableness and cannot stand."  He argues that there was no causal relationship between the need for the victim to attend the private boarding school and his sexual misconduct.  We affirm, finding the court did not abuse its discretion and substantial evidence supports the trial court's restitution order.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

1

## II.

## PROCEDURAL HISTORY

On August 9, 2012, a felony complaint was filed by the San Francisco District Attorney charging appellant with continuous sexual abuse of a child (§ 288.5, subd. (a), count one), two counts of oral copulation of a minor (§ 288a, subd. (c)(1), counts two and three), two counts of sexual penetration by a foreign object (§ 289, subd. (j), counts four and five), sodomy of a minor (§ 286, subd. (c)(1), count six), lewd act on a child (§ 288, subd. (a), count seven) and using a minor for sex acts (§ 311.4, subd. (c), count eight).

On July 19, 2013, appellant entered a change of plea and pleaded guilty to count one, continuous sexual abuse of a child (§ 288.5, subd. (a)). Pursuant to the agreement, appellant would receive a term of six years in prison and the remaining charges would be dismissed. The court found a factual basis for the plea, to wit: from March through the end of July 2012, appellant engaged in three or more acts of substantial sexual and lewd and lascivious conduct, within the meaning of sections 1203.66 and 288, with C.V., a child under the age of 14, while residing in the same home as the minor.[2] The issue of restitution was reserved, with the court retaining jurisdiction over that issue.

A sentencing hearing commenced on September 13, 2013, and a motion to continue the hearing was made by appellant. However, because C.V.'s mother was present from out of state to make a victim impact statement, the court allowed the statement to be made, and sentenced appellant to six years in state prison, consistent with the negotiated plea disposition. Jurisdiction over the issue of restitution again was retained by the court, and a hearing on restitution was scheduled for October 10.

The restitution hearing actually took place on November 1, 2013. Prior to the hearing, both sides submitted written memoranda concerning the appropriate amount of restitution to be awarded. At the hearing, appellant stipulated that certain sums were proper restitution, including $72,000.00 for C.V.'s noneconomic damages, $1,625.00 as

---

[2] The record reveals that at the time of the offense, C.V. was 12 years old and appellant was 39 years old.

2

reimbursement for the cost of psychological therapy already incurred, and $44,400.00 for future therapy.  Appellant's sole objection was to the inclusion of $115,747.50 to cover the costs for C.V. to attend an out-of-state private therapeutic boarding school.  Counsel noted that the costs for therapy sessions C.V. was to receive at the school were included in the stipulated total of $44,400.00 relating to future therapy until she turns 18.  The basis for the objection was that C.V. was not appellant's child and he was not responsible for her education, and that her need to attend such a school was the result of her preexisting psychological and behavioral problems, and not the result of his sexual misconduct.

After hearing from counsel, in addition to the stipulated sums, the court ordered appellant to pay $115,747.50, which represented the cost of the therapeutic boarding school, less $13,741.66, which would be the mother's contribution for education costs had C.V. attended a private day school and lived at home.  In so ordering, the court noted that, while "a little more over the top," the need for C.V. to attend such a school was a direct result of appellant's sexual misconduct.

## III.

## DISCUSSION

### A.  Standard of Review

"The California Constitution gives crime victims a right to restitution and, consequently, requires a court to order a convicted wrongdoer to pay restitution in every case in which a crime victim suffers a loss. (Cal. Const., art. I, § 28, subd. (b)(13)(B).) To implement this requirement, [Penal Code] section 1202.4, subdivision (f), generally provides that 'in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court.' " (*People v. Sy* (2014) 223 Cal.App.4th 44, 62.)

By statute, "The restitution amount 'shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the

3

result of the defendant's criminal conduct.' ([Pen. Code] § 1202.4, subd. (f)(3).)" (*People v. Sy*, *supra*, 223 Cal.App.4th at p. 63.)

"The standard of review of a restitution order is abuse of discretion. 'A victim's restitution right is to be broadly and liberally construed.' [Citation.] ' "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' [Citations.]" (*In re Johnny M*. (2002) 100 Cal.App.4th 1128, 1132.)

" ' "Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.] 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]' [Citation.] [¶]' "[T]he court's discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole. [Citations.]" [Citations.] "There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." ' [Citation.]" (*People v. Sy*, *supra*, 223 Cal.App.4th at p. 63.)

**B. The Trial Court Did Not Abuse its Discretion in Ordering Appellant to Pay the Cost for the Victim to Attend a Therapeutic Private Boarding School for Girls and Young Women**

### *1. The Evidence Bearing on Restitution*

Both sides to this appeal have referred to the presentencing probation report as establishing the facts underlying appellant's conviction, as do we:

"According to the police report dated August 6, 2012, officers were informed by the mother of a victim that the following matter focused on the mother's boyfriend (defendant). The mother and the defendant had been in a boyfriend/girlfriend

relationship for the past seven years. He had also been living with both the mother and her daughter during the course of the offense.

"While interviewing the victim, officers were informed that the defendant caught her in her room spending time on an [I]nternet chat room. The defendant told the victim to show him what she had shown people on the Internet. The defendant told her that if she did not show him what she had shown the people on the Internet, he would tell her mother.

"The victim stated that the defendant made her take off her clothes and then gave her a dildo and told her to use it on herself  The victim proceeded in putting [*sic*] the dildo into her vagina. The defendant then performed oral sex on the victim. The victim then complied when asked by the defendant to perform oral sex on him. He did not ejaculate though. While not using a condom, the defendant subsequently placed his penis inside the victim's vagina and ejaculated on her stomach. While interviewing the victim on the telephone, it was clear that the victim was very scared and upset. She had transitioned from a nervous laugh to crying.

"The victim's mother discovered that her daughter first had sex with the defendant on 3/11/12 and last had sex with him on 7/30/12. She continued to have sex with him on numerous occasions during that time frame."

As noted above, at the September 13, 2013 hearing, C.V.'s mother, Amber W., delivered a victim impact statement to the court. As pertinent to the issue on appeal, she stated that the impact of appellant's molestation of her daughter was "complex, painful, and dark." She emphasized that she and appellant had had a seven-year relationship. As a result of appellant's sexual abuse of C.V., Amber moved the family out of their apartment as she could not bring C.V. back into the home because "every room there is a crime scene." She did this in part at the recommendation of C.V.'s therapist, who said C.V. should not return to the rooms in which she had been raped. As a result of the crimes, Amber W. quit her job and moved out of state to a building owned by her family. While acknowledging that C.V. was curious about sex and had issues making and

keeping friends before the assaults, instead of being a positive role model for her, appellant taught C.V. to be a "worthless sex toy."

After the disclosures and appellant's arrest, C.V. was supposed to start school in San Francisco, but the school asked her to leave after being contacted by appellant's attorney because the school wanted nothing to do with the case. Similarly, after attending the only other middle school available in San Francisco for two days, Amber W. stated that she received a letter from appellant's attorney and then had to explain to the school what was going on.

According to Amber W., C.V.'s "social issues" were magnified because of appellant's abuse. She was teased and labeled a slut by those who knew about the events. As a result, C.V. began to "unravel." She was hospitalized and became very reckless. The psychological effect stemming from the abuse was immense.

At the time of the sentencing hearing, C.V. had been away for about a year at an all-girls, out-of-state boarding school. Because of appellant's sexual misconduct, Amber W. does not believe that C.V. is able to attend a regular school because she does not know how to relate appropriately to boys and men. Her current school has a therapeutic component to support girls who have experienced trauma, and where the trauma C.V. experienced will not be "retriggered." As part of her activities there, she is raising rabbits, riding horses, and playing soccer, and is getting the help she needs in order to "get on the other side of this."

A September 9, 2013 letter from the boarding school was submitted as part of the record relating to the restitution issue. The letter confirmed that C.V. had been a student of that school since February 11, 2013, and it was anticipated that she would remain there until June 2014. The letter from the operations director confirmed that the school is a year-round therapeutic boarding school for middle and high school-aged girls. Among the services available are individual, group, and family therapy services, and psychiatric services by physicians board-certified in child, adolescent, and adult psychiatry.

Appellant's written opposition to the restitution request for reimbursement of these school expenses, confirmed that the boarding school is " 'tailored to the developmental,

6

social, emotional, and academic needs of a pre-adolescent and young adolescent girl.' " According to appellant's own pleading, the school focuses on four areas of its students' lives, namely, therapy, education, social, and family experience. The enrollment fee is all-inclusive and includes costs for " 'uniforms, linens, sports uniforms, and fees.' " The monthly tuition also covers counseling, room and board, recreational activities, a student savings account, textbooks, basic toiletries, wellness and arts and crafts classes, 4-H membership, a rabbit, and yearbooks. During the summer the school conducts a "Quest wilderness trip" which is covered by a summer recreational fee.

Appellant opposed an award of any costs for C.V. to attend this therapeutic private boarding school, except for the cost of actual therapy sessions she receives there. Appellant argued that there was no evidence that C.V.'s need to attend a private boarding school was the result of appellant's misconduct. Although not confirmed by the record, appellant's counsel argued at the November 1, 2013 hearing that C.V. had been "kicked out" of several public and private schools before the molestations based on her own sexually inappropriate conduct with other students. Thus, he argued, the need to attend a boarding school was based on her own preexisting misbehavior unrelated to appellant's molestation.

Counsel alternatively argued in appellant's written opposition that, even if related, a significant portion of her educational expenses at this school were for expenses unrelated to her need for therapy which should not be charged to appellant.

The prosecutor conceded that C.V. had problems at school before the molestations occurred, and indeed, he argued that appellant targeted C.V. because a troubled child is a "ripe" target for abuse. He argued further that her lack of self-esteem and guilt over what had occurred required her to be placed in a much more intense therapeutic environment, and one where there were no boys around.

While commenting that the use of a boarding school was "a little more over the top," the trial court agreed with the prosecution that the necessity for sending C.V. to this school was a direct result of appellant's misconduct. Therefore, the entire amount of the cost for the school was included in the restitution amount.

7

## 2. Analysis

Applying the above-cited legal principles in review of the trial court's restitution order we conclude that the assessment of the entire expense of attending the private out-of-state therapeutic boarding school was supported by substantial evidence, and was not an abuse of discretion. While there is evidence in the record that C.V. had preexisting behavioral problems, there is nothing to suggest that they rose to the level of requiring any type of therapeutic intervention, or that, in fact, such therapy had been necessary before she was molested by appellant.

In her victim impact statement, Amber W. described in detail the emotional and psychological impact the molestation had on C.V. which caused her to "unravel," to develop deep self-esteem inadequacies, and to question her own sense of sexuality in these, her formative years. Indeed, appellant, implicitly at least, conceded that C.V. suffered emotional and psychological damage as a result of his months-long sexual assault on her when she was 12 years old. In this regard we note that he stipulated that *all sums* relating to post-molestation counseling and therapy were properly included as components of the restitution order. Implicit in this concession is the realization that, not only was C.V. damaged by appellant's misconduct, but that there was no preexisting need for counseling, as there was no effort made to apportion or suggest that any of the counseling or therapy she already received or was to receive prospectively was related to a preexisting emotional problem unrelated to the molestations.

Appellant also argues that "notwithstanding [his] conduct, C.[V.] would still have to go to school and her parents would still have to support her until the age of 18." However, there is nothing in the record indicating that any of the responsible adults in C.V.'s life contemplated sending her to a private therapeutic boarding school because of her preexisting behavioral problems. Amber W. stated that the molestations required that she and C.V. move out of their San Francisco apartment and take up residence out of state. While the record is unclear whether that move was to the state in which the boarding school is located, there is little doubt that this move was instigated by appellant's misconduct. Thus, reasonable inferences drawn from the evidence support

8

the trial court's finding that "the therapeutic residential school that . . . the victim is in is a necessary and related expense related to the conduct of [appellant]." (*People v. Sy*, *supra*, 223 Cal.App.4th at p. 63.)

Finally, we address appellant's argument that "while the trial court could rationally require appellant to pay for [C.V.'s] therapy," the court "could not rationally compel appellant to pay for the child's private education and its associated costs such as uniforms, basic toiletries, and room and board." We reiterate that in determining restitution " ' "[t]here is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." ' [Citation.]" (*People v. Sy*, *supra*, 223 Cal.App.4th at p. 63.) The private therapeutic boarding school is quite obviously situated in a rural setting providing each student with a rabbit to care for and horses to ride, among other non-urban therapeutic amenities. Therefore, it is entirely expected that students attending such an institution would also live there and that the school would provide, and bill for, all auxiliary items customary to room and board but not otherwise readily available, including laundry, uniforms, and toiletries.

Under all of the circumstances, we conclude that the trial court's inclusion of the expenses of C.V. to attend a private therapeutic boarding school for girls was supported by evidence and was not an abuse of discretion.

## IV.
## DISPOSITION

The restitution order made under section 1202.4 is affirmed.

9

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
RIVERA, J.